FILED
Feb 23, 2021
01:12 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Meshia Tate | ) Docket No. 2019-01-0399 |
| | ) |
| v. | ) State File No. 88407-2018 |
| | ) |
| Daryl Doney d/b/a Middle Tennessee | ) |
| Respiratory, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) Heard January 28, 2021 |
| Compensation Claims | ) via WebEx |
| Thomas L. Wyatt, Judge | ) |

## Reversed and Remanded

The employee suffered work-related injuries to her left wrist when she fell from a stepladder, requiring emergency surgery. The employer provided ongoing medical treatment with the physician who performed the emergency surgery. After returning to work, the employee complained of right knee pain and swelling. An MRI revealed meniscal tears that the authorized doctor said were caused by the employee's fall. The employee underwent knee surgery but continued to experience symptoms with her knee. The authorized doctor placed the employee at maximum medical improvement and returned her to work, stating arthritis and other changes in her knee seen during surgery were degenerative and not work-related. Without advising the employer, the employee sought further treatment for her wrist and knee with an unauthorized doctor who recommended a referral to a wrist specialist and a second arthroscopic knee surgery for a meniscal tear seen in a more recent MRI. The employee requested a hearing in which she sought to replace her authorized doctor with the physician from whom she sought unauthorized treatment and to obtain the additional treatment he recommended. Following an expedited hearing, the trial court accepted the causation opinion of the physician selected by the employee, concluding the employee would likely prevail at trial in establishing that the meniscal tear seen in the more recent MRI arose out of her employment. Further, the court determined that the authorized doctor failed to treat the employee's ongoing symptoms and that this failure justified a change in the treating physician. The employer has appealed. We reverse the trial court's decision and remand the case.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Pele I. Godkin joined.

1

Richard R. Clark, Jr., and Lauren Ray Hall, Nashville, Tennessee, for the employer-appellant, Daryl Doney d/b/a Middle Tennessee Respiratory

Benjamin Newman, McMinnville, Tennessee, for the employee-appellee, Meshia Tate

**Factual and Procedural Background**

Meshia Tate ("Employee") worked as a technician for Daryl Doney d/b/a Middle Tennessee Respiratory ("Employer") for several years delivering and setting up home health equipment. On November 13, 2018, she was on a stepladder reaching for a piece of equipment when she lost her balance and fell onto her outstretched left arm, resulting in a comminuted fracture of her distal radius. She was transported to a local hospital and underwent emergency surgery by Dr. Martin Fiala to address her fractured wrist.

It is undisputed that Employer never offered Employee a panel of physicians on the state-prescribed form. Employer asserted that an adjuster from its workers' compensation insurance carrier spoke with Employee on the phone about a panel of physicians and that Employee elected to continue treating with Dr. Fiala. Employee disputes that she was ever given a choice of physicians. Nonetheless, Employee continued to treat with Dr. Fiala.

On January 11, 2019, Dr. Fiala released Employee to return to light duty work performing a desk job and answering phones. He restricted her from lifting with her left hand and stated that if the restriction could not be accommodated, she would need to remain off work. Employer was able to accommodate the restriction. At an office visit with Dr. Fiala on February 8, 2019, Employee complained of right knee pain for the first time. She noted that she had been experiencing problems with her knee since she returned to work and said she did not know if she had aggravated her knee after returning to work or if the complaints were related to her November 2018 fall. Dr. Fiala informed Employee he was not authorized to evaluate her knee and told her he would see her for her knee complaints if it was approved by the workers' compensation insurer.

Employer initially denied treatment of Employee's knee but later authorized an evaluation by Dr. Fiala. While Employee was seeking authorization for treatment of her knee, she continued to treat with Dr. Fiala for her wrist injury, complaining of ongoing symptoms with her wrist. In a March 1, 2019 office note, Dr. Fiala stated that Employee had scar tissue adhesions in her wrist and instructed her to massage the area to release the tissue. He indicated that, "[i]n two weeks," he would "try to get her back to work doing her usual duties" and would follow up with her two weeks afterwards to see how she was doing. At a March 29, 2019 visit, Employee continued to complain of ongoing symptoms with her wrist. Dr. Fiala ordered a functional capacity evaluation ("FCE") and indicated he would see Employee after the evaluation "before I release her and give her an impairment rating." Following the FCE, Dr. Fiala completed a final medical report

indicating Employee was returned to unrestricted work on March 15, 2019, and that she had a three percent medical impairment as a result of her wrist injury.

On April 24, 2019, Dr. Fiala evaluated Employee's right knee. He noted that Employee had not initially recognized a knee injury because of the severity of her wrist injury and indicated that, as Employee's wrist began to heal and she returned to work, she noticed increasing difficulty with her knee. Employee had obtained an MRI of her knee on her own, which Dr. Fiala stated confirmed a meniscal tear and would require surgery. Addressing the cause of Employee's meniscal tear, Dr. Fiala stated the following:

> Generally speaking[,] if she had a meniscal tear that preexisted the injury date, she would likely have been symptomatic enough and sought medical care. Most people cannot function with a torn meniscus in their knee, and that seems to be [the] case for [Employee] as a result of the fall. The medical certainty is virtually 100%.

On May 29, 2019 Employee filed a petition seeking medical treatment for her knee. Employer ultimately accepted the knee injury as being compensable, and Dr. Fiala performed arthroscopic surgery on Employee's right knee on September 10, 2019. The pre- and post-operative diagnoses were "[r]ight knee medial and lateral meniscal tears." At subsequent appointments, Employee continued to complain of pain, tightness, and swelling in her knee, particularly following physical therapy sessions at which she performed lunges and squats.

In Dr. Fiala's November 13, 2019 report, he stated that Employee's knee "will not be normal as a result of its arthritic degenerative process, cumulative injuries and knee scope." He stated that arthritis, bone spurs, and "widespread chondral injury" were pre-existing, although he noted that the meniscal tears were "more likely" acute. The report went on to say that "[a]ny knee replacement [i]n the near future is not something that would be covered by [workers'] compensation because of the preexisting components." He returned Employee to work without restrictions at the November 13 visit, indicating she was at maximum medical improvement and had a four percent medical impairment for her knee conditions. The report stated that Employee was welcome to return if she needed additional treatment, although Dr. Fiala recommended she obtain private health insurance for future treatment of her knee. Employee testified Dr. Fiala did not offer any more treatment for her knee after the November 13 visit and that she would not return to him for treatment because "he won't listen to what you have to say." She admitted on cross-examination she had not asked to go back to Dr. Fiala but insisted she had asked Employer for a different doctor "numerous times."

On February 18, 2020, Employee sought a second opinion on her own with Dr. Jeffrey Peterson, an osteopathic surgeon, for both her wrist and knee. Dr. Peterson ordered MRIs, and on March 10, 2020, Employee returned to Dr. Peterson. With respect to her left

3

wrist, Dr. Peterson stated he decided to "move forward with a referral to a hand specialist due to the complexity of the situation in [Employee's] wrist." Addressing Employee's right knee, Dr. Peterson noted a complex tear of the posterior horn of the medial meniscus revealed by the most recent MRI and recommended Employee "move forward with a right knee arthroscopy – diagnostic and surgical." His report stated that, "[r]egarding [Employee's] right knee, [he does] feel as well that this issue is *associated* more than 50% from her previous work injury." (Emphasis added.)

Employer declined to authorize a second knee surgery. As a result, Employee requested an expedited hearing, seeking to replace her treating physician with Dr. Peterson based on her assertion that Dr. Fiala was not providing ongoing care. Employee additionally sought to obtain additional treatment for her wrist and knee. The parties deposed both physicians in preparation for the expedited hearing.

Dr. Peterson testified that Employee needed to see a hand specialist for her ongoing wrist complaints. He stated that "when you get to a certain point, you're like, I've maxed out what I can do. I need help on this one. So we do a referral." He indicated Employee had reached this point in her treatment with Dr. Fiala and needed the expertise of a hand specialist. Dr. Peterson also testified that Employee had voiced dissatisfaction with her treatment with Dr. Fiala and did not want to return to him. He expressed the opinion that, when a patient has lost confidence in a physician, the ultimate outcome of any treatment plan is less successful.

Addressing Employee's right knee complaints, Dr. Peterson recommended additional surgical evaluation and treatment of the tear of the posterior horn of Employee's medial meniscus as seen on the most recent MRI. He testified it is sometimes appropriate to perform a second arthroscopy to determine whether there is a new tear or one that was missed at the time of the earlier surgery. To determine whether the tear indicated on the most recent MRI was present at the time of the earlier surgery, he stated he would "have to see the pictures of the before and after from the arthroscopy." With respect to causation, Employee's attorney and Dr. Peterson had the following exchange:

Q:   . . . The arthritis that she has, could that be caused by the lack in treatment, the ongoing issue of that torn meniscus?

A:   It's possible.

Q:   In your opinion, is it greater than – or 51 percent or greater? That's the new law –

A:   It is.

Q:   – the work comp that we have to go by.

4

A: Absolutely.

Q: Okay. We can't use the "more likely than not."

A: Yeah, it's 51 percent or more.

Q: Considering all other factors?

A: Yeah.

On cross-examination, Dr. Peterson was asked about the impact Employee's weight may have had on her knee and responded, "that's the hard part. We don't know. We don't know, at this point, was it from the work issue? Was it a recurrent tear? Was it something that was not addressed at the time of [the] index procedure, or was it something that came on further along? I can't tell you." He additionally testified that Employee's meniscal tears are "[m]ost likely" related to the work injury and that "with good common sense" he would believe the tear of the posterior horn of Employee's meniscus "has to most likely be *associated* with that prior issue." (Emphasis added.)

Dr. Fiala was deposed four months later. Addressing Employee's wrist, Dr. Fiala said that, based on the most recent MRI from March 2020, he would not recommend any additional treatment for Employee's left wrist and "certainly not" surgical intervention. He testified the value of physical therapy in "regain[ing] a joint's range of motion and strength beyond so many months becomes suspect." He explained that, when someone falls on an outstretched arm in the manner Employee fell, "[a]ll of that cartilage gets absolutely pulverized," and the "trauma to that cartilage is irretrievable. Can't operate it away, can't physical therapy it away."

With respect to Employee's knee injury, Dr. Fiala testified that arthroscopic evaluation will always reveal more issues in a joint than can be seen on an MRI. He testified about the instruments used in the 2019 surgery, including a camera, stating "[w]e photograph as we sweep through the knee, from medial to the middle of the knee, to lateral, and then up into the kneecap." He said the camera "allows us to lay an eyeball on what's actually going on in there. And no matter what an MRI shows, it's always going to be worse."

Addressing the meniscal tears that he repaired in the 2019 surgery, Dr. Fiala said Employee "had tears involving both of them; the medial side was more so than the lateral side." He stated that "[w]hat was really stunning to [him] was the extent of the wear and tear that was throughout the rest of her knee. In all three components, cartilage [was] missing, you know, shredded away." Further, he testified "there's no question the arthritic degenerative component of [Employee's] knee condition is pre-existing. Absolutely no question. That stuff takes years to look like hers looks; not six months, not three months,

but years." Addressing whether the tears he repaired in 2019 could have come from the work-related fall off the ladder, he said they "could," and that "this kind of a knee is the kind of knee that, going forward, will always, forever have meniscal cartilage at risk for tearing again."

Turning to the tear described in Employee's March 2020 MRI as a "[c]omplex tear of the posterior horn of the medial meniscus," Dr. Fiala testified he did not believe the tear was present at the time he performed the September 2019 arthroscopy.

> Q: . . . And when you performed that right knee scope that you conducted or that you took care of in 2019 and you were there visually inspecting the knee, can you state whether or not that posterior horn meniscus tear was present at that time?
>
> A: Don't believe so. And, you know, a complex tear means it's not subtle, it's pretty extensive. You know, and once you do these things after you do a meniscal trimming or whatever it is you're in there doing, you have a little probe and a hook and you tug on things to make sure something is not still going on and make sure things are stable. And so, you know, a complex tear of the posterior horn of the medial meniscus, I would submit she probably retore it or tore it some more.
>
> Q: And the main thing, though, to your knowledge, that posterior horn – when you visually inspected the knee in 2019 to repair the meniscus at the medial and lateral side, you did not witness or see a posterior horn tear of the meniscus?
>
> A: Correct

Dr. Fiala testified he did not think the tear of the posterior horn seen in the March 2020 MRI was related to Employee's work, stating "the MRI from March [2020] is not reflective of the photographs and the surgery I did for her in September of 2019." Further, he said "[t]hat injury, that tear was not there in those photographs on September 10th, 2019."

Dr. Fiala explained why he reversed his initial opinion that Employee's knee condition was "100%" related to her work injury:

> It's hard to know now. That knee certainly puts her knee at risk for tearing a meniscus. A fall off a ladder and not being able to work for several months and not being able to exploit that problem in the knee to know about it sooner could certainly be in play, too.

6

If I hadn't scoped her knee and we just purely had a discussion about could this meniscal tear on the MRI – the first MRI, could that MRI be referencing a meniscal tear that happened when she fell off the ladder, in the absence of a knee scope or these pictures, I think I could've told you, beyond a reasonable doubt, probably related to the fall.

But now that I know what this looks like, and I know that this can also put her meniscus at risk, I have a hard time digging in my heel and saying without a doubt it was the fall off the ladder. It's just – it's harder for me to say that. Could it be related to that? It could be. Is it for sure? I don't know.

Finally, Dr. Fiala expressed his willingness to continue to see Employee and to provide whatever treatment she may need with respect to both her wrist and her knee.

Employee was the only witness to testify in person at the expedited hearing. She acknowledged that, since the date Dr. Fiala placed her at maximum medical improvement for her injuries and released her to return to work, she had not attempted to return to Dr. Fiala for additional care. During the hearing, Employee objected to the admission into evidence of photographs taken during the 2019 knee surgery. Employee's counsel argued he had requested that Dr. Fiala provide his medical records, but the photographs were not sent. He acknowledged that Dr. Fiala did not send the photographs to either party and argued that, because the photographs were not made available to him, he could not provide them to his expert for review. The trial court sustained the objection "as it relates to Dr. Peterson being cross-examined" about whether the photographs would "be helpful" to Dr. Peterson, but otherwise overruled the objection.

The trial court found that Employer failed to provide Employee with a panel of physicians and concluded that Dr. Fiala's "failure to treat [Employee's] ongoing symptoms" justified designating a new treating physician. In support of that conclusion, the court noted that

Dr. Fiala declined to treat [Employee's] ongoing wrist pain for several months after he returned her to work without restrictions. He also released her without restrictions despite her right-knee complaints. Significantly, Dr. Fiala counseled [Employee] when he released her that she should get private health insurance to pay for "any further concerns" with her knee. The Court holds those circumstances communicated to [Employee] that Dr. Fiala had nothing else to offer under workers' compensation for ongoing treatment.

. . . .

Here, Dr. Fiala dismissed [Employee] from his care, despite her ongoing complaints, without even trying to determine the cause of her pain or if

further treatment was in order. Further, Dr. Fiala released [Employee] for her knee under the unsubstantiated assumption that workers' compensation would not pay for any other treatment.

The court concluded these circumstances justified allowing Employee to select her own treating physician.

The trial court additionally ordered Employer to provide treatment for Employee's right knee, reasoning that the court

also considered Dr. Fiala's testimony that he did not find a posterior-horn tear during surgery. The Court gives little weight to that testimony because the pre-surgery MRI of [Employee's] right knee showed both lateral and medial tears that extended into the posterior horn. The Court also discounted Dr. Fiala's testimony because he so radically changed his causation opinion. Before [Employer] authorized surgery, he was "100%" certain that the meniscal tears were from the fall. It was only after he performed surgery that he felt he could not attribute any of the meniscal tears to the work-related fall.

The court stated that, because of those findings, the court "accepts Dr. Peterson's opinion that the current posterior-horn tear arose primarily from the fall." Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2020). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2020).

**Analysis**

Employer raises two issues: (1) whether the trial court erred in determining that the posterior horn meniscal tear identified in the March 2020 MRI arose primarily out of the November 2018 work accident; and (2) whether the trial court erred in replacing Dr. Fiala with Dr. Peterson as Employee's authorized physician.

*Whether the Current Posterior Horn Tear Arose Primarily out of the Employment*

Generally, to be compensable, an injury must arise primarily out of and in the course and scope of employment and must cause disablement, death, and/or the need for medical treatment of the employee. Tenn. Code Ann. § 50-6-102(14) (2020). Furthermore, "[a]n injury 'arises primarily out of and in the course and scope of employment' only if it has been shown by a preponderance of the evidence that the employment contributed more than fifty percent (50%) in causing the injury, considering all causes." Tenn. Code Ann. § 50-6-102(14)(B). Here, Employer accepted the compensability of the wrist injury and the medial and lateral meniscal tears in the right knee disclosed in the April 2019 MRI and authorized Dr. Fiala to perform arthroscopic surgery. However, Employer disputed the compensability of the posterior horn tear identified in the March 2020 MRI. The trial court concluded Employee had established she would likely prevail in proving the posterior horn tear was causally related to the employment. We disagree.

Prior to performing the September 2019 arthroscopy, Dr. Fiala expressed with a great degree of certainty that Employee's meniscal tears identified in the April 2019 MRI were the result of her November 2018 work-related accident. However, after performing surgery and inspecting the condition of Employee's knee through the camera used during the surgery and reviewing the photographs of the procedure, Dr. Fiala concluded the degenerative condition of Employee's knee suggested her torn menisci may not have been causally related to the November 2018 accident. The trial court accepted what it described as "Dr. Peterson's opinion that the current posterior-horn tear arose primarily from the [November 2018] fall" and cited two reasons for the court's conclusion that Dr. Fiala's causation opinion was entitled to "little weight."

First, the court gave little weight to Dr. Fiala's testimony that he did not find a posterior horn tear during the 2019 surgery, stating "the pre-surgery MRI of [Employee's] right knee showed both lateral and medial tears that *extended into* the posterior horn." (Emphasis added.) Second, the trial court "discounted Dr. Fiala's testimony because he so radically changed his causation opinion." We conclude that, in reaching its conclusion, the trial court failed to give sufficient weight to the expert testimony concerning the photographs of the September 2019 surgery and to Dr. Fiala's testimony concerning his intra-operative inspection of Employee's knee.

9

Addressing Dr. Peterson's causation testimony, the trial court stated, "Dr. Peterson testified that all the meniscal tears in [Employee's] right knee, including the unrepaired tear, arose primarily out of and in the course and scope of her work-related fall." Despite a diligent search, we do not find this testimony in the record. During oral arguments, we asked Employee where in the record this testimony appears, and counsel referred us to the following colloquy in his direct examination of Dr. Peterson:

Q: [Employee] has, I think you said, more arthritis than somebody that age?

A: Yeah, she does.

Q: And we talked about that, that this happened – if this injury happened 11/13 of '18, she doesn't get treatment for it until –

A: At least a year.

Q: – almost a year later. The arthritis that she has, could that be caused by the lack in treatment, the ongoing issue of that torn meniscus?

A: It's possible.

Q: In your opinion, is it greater than – or 51 percent or greater? That's the new law –

A: It is.

Q: – the work comp that we have to go by.

A: Absolutely.

Q: Okay. We can't use the "more likely than not."

A: Yeah, it's 51 percent or more.

Q: Considering all other factors?

A: Yeah.

This testimony does not address the cause of the "unrepaired tear" in Employee's knee, and it does not address the cause of "all the meniscal tears in [Employee's] right knee." We conclude the trial court erred in stating that "[r]egarding causation, Dr. Peterson testified that all the meniscal tears in [Employee's] right knee, including the unrepaired tear, arose primarily out of and in the course and scope of her work-related fall." Dr.

Peterson testified about the cause of the tear revealed in the 2020 MRI, but only *associated* the tear with Employee's "prior issue."

A:  . . . Is it possible that just her weight and her activity caused a new tear in this meniscus?  I understand the question.  So that – that's the hard part.  We don't know.  We don't know, at this point, was it from the work issue?  Was it a recurrent tear?  Was it something that was not addressed at the time of [the] index procedure, or was it something that came on further along?  I can't tell you.

Q:  Okay.

A:  Does it seem likely, with the issues that she never really got better after the surgery?  Does it seem plausible that that is associated with that work injury and then continued pain even after the knee scope?  Most likely, because I don't have any documentation from her that there was any other falling, twisting injury, or anything else like that that would, you know, tell me that, oh, this is a new issue.  You know what I'm saying?

Q:  Yes, sir.

A:  So I have to, with good common sense, think back, well, this has to most likely be associated with that prior issue.

The court discounted Dr. Fiala's testimony that he did not find a posterior horn tear during surgery based on the court's review of the April 2019 MRI report.  The court stated that the MRI "showed both lateral and medial tears that *extended into* the posterior horn." (Emphasis added.)  However, neither expert testified that the 2019 MRI showed a posterior horn tear.  Dr. Fiala testified that he did not believe the posterior horn tear was present when he performed the 2019 surgery.  Dr. Peterson testified the 2019 MRI showed a medial meniscus tear, adding that the "[l]ateral meniscus has a questionable tear as well."  He did not testify that the tear of the posterior horn was present at the time of the 2019 surgery; he merely suggested that it might have been present and overlooked during the surgery.  As we have discussed previously, judges are not well-suited to giving medical opinions.  *See Scott v. Integrity Staffing Solutions*, No. 2015-01-0055, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *8 (Tenn. Workers' Comp. App. Bd. Aug. 18, 2015).  The trial court's conclusion that the posterior horn tear was present at the time of the 2019 surgery is not supported by the expert medical testimony or by the record as a whole.

Even if Dr. Fiala's testimony were to be discounted, Dr. Peterson's testimony was insufficient to establish causation.  Dr. Peterson testified on direct examination that it would be helpful for him to see pictures of the surgery to determine whether he believed Dr. Fiala overlooked the posterior horn tear during surgery.  His testimony, considered as

a whole, is that he does not know what caused the posterior horn tear indicated by the 2020 MRI. His testimony is insufficient to establish Employee will likely prevail at trial in showing the posterior horn tear arose primarily out of the employment. Accordingly, we conclude the evidence at this interlocutory stage of the case preponderates against the trial court's determination that the current posterior horn tear "arose primarily from the [2018] fall."

*Replacement of Dr. Fiala with Dr. Peterson*

It is undisputed that Employer did not provide a panel of physicians to Employee on the state-prescribed form but, instead, authorized ongoing treatment with the physician who performed her emergency surgery. Although Employee testified that she asked for a different doctor on multiple occasions, there is no proof of that in the record beyond her testimony. Indeed, to date, there is no evidence Employee has requested a panel of physicians, and the court did not address whether it should order Employer to provide a panel of physicians from which Employee could select a treating physician to replace Dr. Fiala. Further, no one has asserted on appeal that the trial court should have ordered Employer to provide a panel of physicians. As stated in the trial court's order, the court held a hearing "in which [Employee] sought to replace her authorized treating physician for not providing ongoing care and [to] obtain treatment for a meniscal tear." The trial court ordered that Employer "authorize Dr. Jeffrey Peterson to replace Dr. Martin Fiala as [Employee's] authorized treating physician." Thus, the only issue presented as to the treating physician is whether the trial court erred in replacing Dr. Fiala with Dr. Peterson as the authorized treating physician.

The trial court based its decision to change the authorized physician on two primary considerations. First, the trial court correctly noted that Employer "did not comply with the law by providing [Employee] a choice of physicians" for either her wrist or knee injuries. Second, the trial court agreed with Employee's contention that "Dr. Fiala's failure to treat her ongoing symptoms justifie[d] a change in [the] treating physician." The court stated that Dr. Fiala declined to treat Employee's ongoing wrist pain for several months after he returned her to work; that Dr. Fiala released Employee without restrictions "despite her right-knee complaints"; and that Dr. Fiala "counseled [Employee] when he released her that she should get private health insurance to pay for 'any further concerns' with her knee." According to the trial court, "[t]hose circumstances communicated to [Employee] that Dr. Fiala had nothing else to offer under workers' compensation for ongoing treatment." However, as noted by the trial court, Employer's "failure to provide a panel for treatment, standing alone, does not mandate a change in authorized physicians." *See Ducros v. Metro Roofing and Metal Supply Co., Inc.*, No. 2017-01-0228, 2017 TN Wrk. Comp. App. Bd. LEXIS 62, at *11 (Tenn. Workers' Comp. App. Bd. Oct. 17, 2017).

As previously noted, Dr. Fiala's initial treatment included emergency surgery performed on the day of Employee's accident. He continued treating Employee, seeing

her multiple times in the months following her wrist surgery for follow-up, removing hardware placed during surgery, prescribing physical therapy, and assigning restrictions.

On May 29, 2019, Employee filed a petition for benefits through her attorney, but a change in the authorized physician was not requested. The record on appeal includes the petition but does not include an attachment referenced in the petition. However, the dispute certification notice identified the disputed issues as compensability and medical benefits. Nothing in the petition for benefits or the dispute certification notice suggests Employee was dissatisfied with Dr. Fiala, was requesting a panel of physicians, or wished to see another physician. Although an expedited hearing was scheduled, Employer ultimately accepted the knee injury as a compensable injury, and, presumably, the expedited hearing was cancelled.[1] Once Employer accepted Employee's right knee claim as compensable, Employee treated with Dr. Fiala for those complaints, undergoing surgery to repair her meniscal tears on September 10, 2019.

Employee saw Dr. Fiala on many occasions for both left wrist and right knee complaints over the course of approximately one year. Dr. Fiala's notes are silent with respect to any disagreement he may have had with Employee or any dissatisfaction she may have expressed concerning her care. At no point during these visits did Dr. Fiala indicate he was unwilling or unable to continue treating her for either her left wrist or right knee injuries. Employee testified she repeatedly requested a new physician, but, aside from her testimony, the record does not reflect any such requests being made either by Employee prior to being represented by counsel or through counsel after he entered the case. Dr. Fiala performed surgery on Employee's wrist and knee, and he continued his treatment until he thought Employee had reached maximum medical improvement for her work-related injuries. Rather than request additional doctor visits, Employee sought unauthorized medical care and requested the court to change her treating physician.

Further, contrary to the trial court's conclusions, there is no evidence that Dr. Fiala released Employee "without even trying to determine the cause of her pain or if further treatment was in order." Rather, Dr. Fiala's records reflect that he provided treatment he believed was reasonable and necessary and causally related to the employment. The fact that Employee continues to have complaints is not evidence that Dr. Fiala did not provide appropriate treatment. Moreover, Dr. Fiala did not dismiss Employee from his care. He indicated both in his treatment notes and in his deposition that he would be happy to continue treating her. The record does not support the court's interpretation of Dr. Fiala's suggestion that Employee obtain private health insurance as an indication he had nothing further to offer her in the way of treatment. The court concluded that Dr. Fiala's statement about private insurance indicated an "unsubstantiated assumption that workers' compensation would not pay for any other treatment." However, it is clear from Dr. Fiala's

---

[1] Employee returned to Dr. Fiala on August 29, 2019 and, according to the report, the August 21 expedited hearing "was derailed by work comp accepting responsibility for the knee injury."

records and deposition that his recommendation that Employee obtain private insurance was made not because he believed workers' compensation would not pay for further care but because he did not believe that Employee's ongoing knee complaints arose primarily out of her employment. Employee has presented no evidence to support the trial court's conclusion that Employer should authorize Dr. Peterson to provide ongoing medical care in light of Dr. Fiala's longstanding treatment of Employee's injuries and his willingness to continue to provide treatment for her work-related injuries. *See Buchanan v. Mission Ins. Co.*, 713 S.W.2d 654, 657 (Tenn. 1986).

Again, we note that both in the trial court and on appeal, Employee did not request a panel of physicians; rather, she sought to replace the authorized physician with the physician she selected on her own without notice to or consultation with Employer. Under these circumstances, we conclude the evidence was insufficient for the trial court to change the authorized treating physician.

**Conclusion**

The preponderance of the evidence at this interlocutory stage does not support the trial court's conclusions that Employee is likely to prevail at trial in establishing a causal connection between her employment and her posterior horn tear or in establishing she is entitled to ongoing treatment with Dr. Peterson as her authorized physician. Accordingly, we reverse the trial court's order and remand the case. Costs on appeal are taxed to Employee.

14



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Meshia Tate | )  Docket No. 2019-01-0399 |
| | ) |
| v. | )  State File No. 88407-2018 |
| | ) |
| Daryl Doney d/b/a Middle Tennessee | ) |
| Respiratory, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | )  Heard January 28, 2021 |
| Compensation Claims | )  via WebEx |
| Thomas L. Wyatt, Judge | ) |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 23rd day of February, 2021.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Benjamin R. Newman Sharon Kelley | | | | X | bnewman@galligannewmanlaw.com skelley@galligannewmanlaw.com |
| Richard R. Clark, Jr. Lauren Ray Hall | | | | X | rclark@eraclides.com lrayhall@eraclides.com |
| Thomas L. Wyatt, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

*O. Yearwood*

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov